J-A02011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| HOWARD CONCRETE PUMPING COMPANY, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| PEAK INNOVATIONS, INC., AND DREW RAYMOND NELSON, AN INDIVIDUAL, AND TJ MINC, LLC | : | No. 725 WDA 2017 |

Appeal from the Judgment Entered April 21, 2017
In the Court of Common Pleas of Allegheny County Civil Division at No(s):
GD14-021268

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 27, 2018**

Howard Concrete Pumping Company, Inc. ("Howard") appeals from the judgment entered in its favor and against Peak Innovations, Inc. ("Peak") in this contract case.  Specifically, Howard challenges a pre-trial evidentiary ruling that limited its ability to establish damages.  We affirm.

The trial court offered the following summary of the facts underlying this action and the procedural history of the case.

> [Howard] mixes and supplies grout for injection into underground spaces such as abandoned mines so as to improve ground stabilization.  Over nearly forty years, Howard developed a variety of equipment and techniques to produce grout effectively at project sites.  In 2012, Howard contracted with [Peak] an equipment manufacturer.  Under the contract, Howard expected to buy from Peak a new and unique mixing plant, a custom-designed piece of equipment intended to provide a range of cementitious products with more efficiency and accuracy than had been previously accomplished in the industry.  The novelty of this plant was such that Howard, already a long-time leader in the grout-related industry, believed it (Howard) would be able to

move its business to the "next level," evidently in terms of productivity, efficiency, and/or profit. The contract negotiations involved a number of documents and information such as proposals, purchase orders, warranties, and a non-disclosure agreement. Defendant Drew Nelson was an owner and/or executive of Peak involved in the negotiations and the eventual sale of the plant. Also involved in the contract negotiations and/or sale was TJM, Inc. ("TJM"). TJM was an authorized dealer or sales agent for Peak.

According to Howard, Peak delivered the plant in April 2013, several months late and, moreover, the plant did not operate properly. Howard contended that, as a result of the late delivery and the defects in the plant, Howard lost money. In its complaint filed in this suit, Howard alleged that its losses resulted from, for example, an inability to use the plant—or an inability to use it fully—on one or more of the jobs for which it was intended; the need to use replacement equipment; low productivity/efficiency when the subject plant was used; repair and troubleshooting costs; and costs for idle manpower. Howard also alleged that Peak and Nelson sold one of Howard's competitors a plant that Peak manufactured using Howard's trade secrets and other protected information. As defendants in this litigation, Howard initially named Peak, Nelson, and TJM. Howard's claims against Peak and Nelson included breach of contract, breach of warranties, breach of the non-disclosure agreement, and misappropriation of trade secrets. Howard sued TJM for breach of both contract and warranties.

Prior to trial, all Defendants anticipated that Howard would seek to claim damages for, *inter alia*, Howard's inability to secure a particular project with the Ohio Department of Transportation in or near Zanesville. Defendants sought to exclude evidence of that project from trial. Arguing to th[e trial] court, Howard contended that, because the subject plant was not properly operable, Howard had submitted a bid for the Zanesville work based on the anticipated use of other/older equipment. Because that equipment was not as cost-effective as Howard expected the new plant to be (if properly operable), Howard's Zanesville bid was higher with the old equipment than it would have been with the new plant. Howard was not awarded the Zanesville job. Thus, Howard's position was that, if the new plant had been operable, Howard would have submitted a lower bid, the Ohio Department of Transportation would have selected

- 2 -

Howard for the Zanesville job, and Howard would have made a profit on the job.

Defendants raised several points in opposition to Howard's Zanesville argument, including the contention that the jury in this case would need to speculate to determine whether the Ohio Department of Transportation would have awarded Howard the Zanesville project based solely on a lower bid. In this vein, Defendants contended that, in the course of considering bids, the appropriate Ohio officials were required, by Ohio law, to consider numerous factors in addition to the bid amount. Along these lines, Defendants also noted that Howard had no intention of calling any Ohio state official to testify about the issue of whether Howard would have received the Zanesville project if Howard had lowered its bid amount. Defendants' point was simply that any claim of Zanesville damages was too uncertain to admit evidence thereon at trial. Th[e trial] court granted Defendants' motions to preclude evidence of the Zanesville bid because the court found the Zanesville matter to be speculative. . . . Before trial, TJM and Howard settled their disputes. Peak and Nelson remained as Defendants.

The case was heard by a jury. The jurors found in Defendants' favor on the counts of breach of confidentiality and misappropriation of trade secrets, but awarded Howard $50,000.00 on its breach of contract and warranty claims. Howard filed post-trial motions challenging th[e trial] court's exclusion of the Zanesville evidence and requesting an award of prejudgment interest. The court denied Howard's post-trial request for a new trial on the Zanesville issue but granted Howard $1,500.00 in prejudgment interest. The court then molded the verdict accordingly and ordered entry of judgment on April 17, 2017. Howard filed this direct appeal on May 16, 2017. On May 19, 2017, this court ordered Howard to file a statement of matters complained of on appeal. Howard filed its statement on June 9, 2017.

Trial Court Opinion, 6/17/16, at 1-4 (citations omitted).

Howard presents the following questions for this Court's review.

1. Did the trial court err in granting Peak's Motion *in Limine* and barring Howard's evidence related to the Zanesville Project,

- 3 -

where entitlement to and the amount of consequential damages are questions of fact for the jury?

2.    Did the trial court err in substantively adjudging Howard's claims for consequential damages as inherently speculative?

3.    Did the trial court err by barring Howard's entire claim for consequential damages related to the Zanesville Project by way of a motion *in limine*, improperly rendering the motion *in limine* a motion for summary judgment?

Howard's brief at 3.

As all of Howard's issues concern the trial court's decision to preclude Howard from offering evidence of damages from not obtaining the Zanesville contract, we address them together. The following principles guide our review.

> A motion *in limine* is a pretrial mechanism to obtain a ruling on the admissibility of evidence, and it gives the trial judge the opportunity to weigh potentially prejudicial and harmful evidence before the trial occurs, preventing the evidence from ever reaching the jury. A trial court's decision to grant or deny a motion *in limine* is subject to an evidentiary abuse of discretion standard of review.
>
> > Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Seels v. Tenet Health Sys. Hahnemann, LLC*, 167 A.3d 190, 206 (Pa.Super. 2017) (citations and internal quotation marks omitted).

Turning to the substantive issue, we observe that "[t]he general rule of law applicable for loss of profits in a contract action permits recovery of lost profits when there is evidence to establish them with reasonable certainty, there is evidence to show that they were the proximate consequence of the wrong and if they were reasonably foreseeable." *Quinn v. Bupp*, 955 A.2d 1014, 1021 (Pa.Super. 2008) (internal quotation marks omitted). "To recover for lost profits there must be affirmative evidence that the loss resulted from the breach of contract. It is not necessary that the amount be shown with absolute or mathematical certainty, but only that it be approximated by competent proof." *Ne. Vending Co. v. P.D.O., Inc.*, 606 A.2d 936, 939 (Pa.Super. 1992) (citations omitted).

However, "damages are not recoverable if they are too speculative, vague or contingent[.]" *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988). "The question of whether damages are speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages." *Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 661 (Pa.Super. 2014) (*en banc*); *see also Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998) ("Damages are considered remote or speculative only if there is uncertainty concerning the identification of the existence of damages rather than the ability to precisely calculate the amount or value of damages."); *Barrack v. Kolea*, 651 A.2d 149, 155

(Pa.Super. 1994) ("Damages are not speculative when they are certain in fact, even if uncertain as to amount.").

With the various issues it argues on appeal, Howard contends that the trial court usurped the jury's role of judging the sufficiency and weight of the evidence. Howard's brief at 15. Howard maintains that Peak's challenge to the speculative nature of the damages went to the weight of the evidence, not its admissibility. *Id*. at 22 (citing ***Zieber v. Bogert***, 773 A.2d 758, 763 (Pa. 2001)). It avows that motions *in limine* "are unsuitable vehicles for parties to allege that a claim must fail because it lacks evidentiary support, and are inappropriate devices for resolving substantive issues." *Id*. at 30. Howard argues that the trial court paradoxically precluded Howard from putting its evidence before the jury and then ruled that Howard's claim failed for lack of evidence. *Id*. at 28.

Howard further asserts that it did proffer evidence, in the form of an expert report, to establish that lost profits from the Zanesville job were foreseeable, calculable, and proximately caused by Peak's breach of contract. *Id*. Howard insists that it had no duty to prove that it would have won the Zanesville job, but rather "only that it was denied the opportunity to fairly compete for the bid." *Id*. at 21 (citing ***Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A.***, 462 A.2d 686, 697 (Pa.Super. 1983)).

We begin with Howard's procedural arguments. On October 16, 2017, Howard filed its pretrial statement listing its witnesses and exhibits, and

indicating that its damages were set forth in the expert report of Michael H. Bronder, CPA. Pretrial Statement, 10/17/16, at 4-21. On November 21, 2016, Peak filed a motion *in limine* claiming that Mr. Bronder's expert opinion was insufficient to show that Peak was the cause of Howard losing profits from the Zanesville job. Motion *in Limine*, 11/21/16, at ¶¶ 10-23. The trial court entered an order granting the motion on December 12, 2016, indicating that Howard was not permitted to introduce evidence relating to "damages for lost profits associated with the Ohio Department of Transportation project located on Interstate 70 in the vicinity of Zanesville, Ohio, as set forth in Plaintiff's expert report submitted by Michael H. Bronder[.]" Order, 12/12/16, at ¶ A. The trial court explained its ruling as follows.

By virtue of statutes and interpretive case law, Ohio has its own criteria for awarding public projects like the Zanesville job. *See*, *e.g.*, O.R.C.Ann. §9.312; *see also Steingass Mechanical Contracting, Inc. v. Warrensville Hts. Bd. of Education*, 784 N.E.2d 118, 121-24 (Ohio Ct. App. 2003) (discussing criteria for awarding public projects to "responsible" bidders under Ohio Revised Code § 9.312; and indicating the determination of statutorily required "responsibility" under Ohio law will differ from project to project). Howard was not going to call any Ohio official to offer the jury any testimony about the Ohio criteria and/or the Ohio process for evaluating bids, to offer facts giving the jury any insight as to any probability that Ohio might have awarded Howard the Zanesville project if Howard had submitted a lower bid, or to shed light on the issue of whether a lower bid alone could have rendered Howard's bid successful. Furthermore, Howard itself admitted that, for any official from the Ohio Department of Transportation (*i.e.*, an official involved in the bid-evaluation/bid-acceptance process) to testify about whether Howard could have won the project with a lower bid would involve "speculation that [the Ohio official] couldn't even

give." Howard acknowledged that "no one can go back in time" and/or tell "who was going to get that job" if the bid had changed. In short, while recognizing that even Ohio officials familiar with the Ohio criteria and process could do no more than speculate about whether Howard might have won the project with a lower bid, Howard nevertheless maintained that the jurors should have somehow been permitted to reach that conclusion—*i.e.*, to reach a probability determination that Howard would have secured the project and would have earned a certain profit if Howard had lowered its bid price.

Howard's request to pursue damages in connection with the Zanesville job was untenable. Howard simply did not proffer any evidence sufficient to demonstrate anything beyond a speculative claim that Howard might have won the project at a decreased bid level. Along these lines, Howard suggested no reasonable way for the jurors to determine how Ohio officials would have applied Ohio criteria to Howard's bid, and whether those officials might or might not have awarded the work to Howard had Howard tendered a bid lower than the one actually submitted. In sum, whether Howard would have received the job was a purely speculative matter. Under these circumstances, the probability of damages sought by Howard for the Zanesville job was likewise speculative. Simply put, because it could not be proven to any reasonable certainty that Howard would have been awarded the project, the likelihood of any damages could not be proven with reasonable certainty. Lost profits from the Zanesville job were, therefore, entirely speculative and unrecoverable.

Trial Court Opinion, 6/17/16, at (some citations omitted).

Howard complains that Peak improperly used a motion *in limine* as a substitute for a motion for summary judgment. However, it offers no binding authority to support its claim of error in this regard. Instead, Howard relies upon federal court cases that have no precedential effect in this Court. **See** Howard's brief at 29-30 (citing cases). The only Pennsylvania case Howard cites to support its contention that the trial court

committed a procedural error is *Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 665 (Pa.Super. 2007). Howard suggests that *Northeast Fence* stands for the proposition that a challenge to a party's ability to recover is properly made after the presentation of evidence at trial, not through a motion *in limine*. Howard's brief at 31.

In *Northeast Fence*, the plaintiff sued the defendant under the mutually-exclusive theories of breach of contract and unjust enrichment.[1] As the plaintiff indicated that it would introduce evidence of a written agreement, the defendant filed a motion *in limine* to preclude recovery under the unjust enrichment theory. *Northeast Fence*, *supra* at 667. In rejecting the defendant's argument that the trial court erred in denying the motion, this Court explained as follows.

> In making this argument, [the defendant] misperceives the nature and purpose of a motion *in limine*. A motion *in limine* is a device for obtaining rulings on the admissibility of evidence prior to trial. Herein, [the defendant's] "motion *in limine*" did not seek to prevent or permit the admission of evidence at trial. Instead, [the defendant] was arguing that [the plaintiff's] evidence was going to prevent recovery under an unjust enrichment cause of action. This type of challenge is properly made after presentation of the evidence, by means of a compulsory nonsuit[.]

*Id*.

---

[1] "A cause of action for unjust enrichment arises only when a transaction is not subject to a written or express contract." *Heldring v. Lundy Beldecos & Milby, P.C.*, 151 A.3d 634, 645 (Pa.Super. 2016) (internal quotation marks omitted).

In the instant case, Peak's motion did not seek to preclude Howard's cause of action for breach of contract or breach of warranty. Rather, it challenged the admissibility of the evidence that Howard identified in its pretrial statement to support some of the damages it claimed flowed from Peak's breach. Hence, contrary to Howard's assertion, *Northeast Fence* validates, rather than disproves of, Peak's use of a motion *in limine*.

Further, this Court has recognized that it is "not uncommon" that a pretrial evidentiary ruling may effectively determine the result of not merely an item of claimed damages, but an entire case. *Nobles v. Staples, Inc.*, 150 A.3d 110, 118 (Pa.Super. 2016) (affirming dismissal of case on summary judgment after trial court excluded the plaintiff's expert witness based upon a motion *in limine* filed three weeks prior to trial). The fact that an evidentiary ruling in effect puts a party out of court does not invalidate the pretrial ruling. *Id*.

Turning to Howard's substantive arguments, we observe that it is well-established that "a jury cannot be permitted to reach its verdict on the basis of speculation or conjecture." *Williams v. Dulaney*, 480 A.2d 1080, 1083 (Pa.Super. 1984). Howard contends, however, that the speculative nature of the lost profits from the Zanesville job went to the weight of the evidence, not whether it was admissible. Howard's brief at 22 (citing *Zieber*, *supra*).

In *Zieber*, our Supreme Court considered whether evidence of the risk of recurrence of cancer could be considered by a jury assessing damages in

a case alleging that the defendant doctor's late diagnosis of the plaintiff's lymphoma was malpractice. The defendant contended that such evidence was inadmissible given the decision in *Simmons v. Pacor, Inc.*, 674 A.2d 232 (Pa. 1996), in which the High Court held that asymptomatic, benign asbestos-related conditions were not compensable injuries when not accompanied by actual physical impairment, and the speculative damages for fear of cancer and increased risk of cancer associated with exposure to asbestos were not recoverable in the absence of a physical injury. *Id*. at 238. Nonetheless, the *Zieber* Court held that "evidence of the increased risk and/or fear of recurrence of cancer is admissible for the purpose of establishing damages in a medical malpractice case alleging a physician's negligence in failing to properly diagnose the disease." *Zieber*, *supra* at 763. In so holding, the Court stated the following, upon which Howard hangs its hat: "Appellants' concerns regarding the speculative nature of such damages can be presented to the jury during argument, as such challenges go to the weight, rather than the admissibility of the evidence." *Id*.

*Zieber* does not compel reversal in the instant case. *Zieber* does not contradict the law, cited above, that, although the presence of guesswork in putting a dollar value on the harm suffered does not render damages speculative, conjecture as to the actual existence of damages is not permissible. *See*, *e.g.*, *Kituskie*, *supra* at 1030 ("Damages are considered remote or speculative only if there is uncertainty concerning the

identification of the existence of damages rather than the ability to precisely calculate the amount or value of damages."). ***Zieber*** stands for the proposition that, although the amount of damages for fear of recurrence of cancer, as with all emotional distress damages, are not easily quantifiable, the jury may consider them and render an award it deems appropriate. Quite contrary to Howard's suggestion, ***Zieber'*** s holding is entirely consistent with the principle that impermissibly-speculative damages are those the very existence of which cannot be shown with a reasonable degree of certainty, as opposed to reasonably-certain damages that are not easily quantifiable.

The trial court determined that the jury would have to engage in speculation to identify the existence of any harm to Howard in connection with the Zanesville job  because Howard lacked proof that it was reasonably likely to have had the successful bid for the Zanesville job had Peak lived up to its contractual obligations.  Citing ***Merion Spring Co.***, ***supra***, Howard claims that its burden was merely to show that Peak's breach denied it the opportunity to fairly compete for the Zaneville job, not to prove that it definitely would have had the successful bid.  Howard's brief at 21.

In ***Merion Spring Co.***, the defendant-buyer, a Mexican company, contracted to purchase from the plaintiff-seller used machines for manufacturing automotive springs.  Although the buyer paid part of the contract price, it refused to tender the balance, citing defects noticed upon

inspecting the machines. *Merion Spring Co.*, *supra* at 690. The seller sued for breach of contract, seeking the outstanding balance of the purchase price, and the buyer counterclaimed, averring that it was the seller who breached, and demanding damages, including lost profits. *Id*. at 688. At a bench trial, the judge found in favor of the buyer and awarded damages. The trial court *en banc* granted post-trial relief to the seller, holding that the buyer had not shown lost profits with sufficient certainty because its business was unestablished at the time it contracted to buy the machines. *Id*. at 688-89. On appeal, this Court reversed, holding that the buyer had sufficiently proven lost profits.

The **Merion Spring Co.** Court rejected the buyer's contention that reasonable certainty is necessary only to establish the fact of a loss, not to prove the amount of the loss, stating as follows:

> our cases stand for the proposition that reasonable certainty is required for both the fact of loss and the amount of loss sustained. Additionally, we note that this is not a requirement of mathematical certainty, but only that the estimate made as to the amount of lost profits be reasonably certain. The process of estimation, of course, need not be completely free of analytical or statistical error for that is the nature of an estimate. However, **the requirement of reasonable certainty as to the amount as well as to the fact of loss assures that the finder of fact will not determine the rights of any party upon the basis of speculation**.

*Id*. at 696 n.8 (emphasis added). However, it determined that the buyer proved both the fact and the amount of lost profits attributable to seller's breach.

The Court noted that proving lost profits is more easily done in cases where an established and continuing business is at issue, than in cases involving a new enterprise that lacks "the business records necessary to determine [lost] profits with specificity." *Id*. at 698. However, it noted that lost profits from a new business "may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Id*. at 696 (internal quotation marks omitted).

The buyer in *Merion Spring Co.* offered testimony from its general manager, Emilio Cano Bazaldua, to prove lost profits, which we quote at length to contrast with the instant case.

Cano provided a wealth of details concerning economic and financial conditions prevailing in Mexico during the four years following the completion of construction of the plant intended to house the machinery. Cano provided specific data concerning the Mexican government's protection of domestic manufacturing, estimated plant production, prices, direct and indirect labor cost, the cost of skilled and supervisory labor, administrative and sales staff and operations expense and the broad outlines of the applicable tax structure. The figures he produced came from his own knowledge; either he personally developed the data in his capacity as [the buyer's] general manager or he was aware of the prevailing rates and figures because of his long association with the automobile parts industry. Cano also took into consideration the devaluation of the Mexican peso in September, 1976. At almost every point, Cano utilized patently conservative data in estimating [the buyer's] lost profits, forcing estimated income down and estimated expenses up. Under ideal or even under more realistic conditions, [the buyer's] lost profits could have been substantially higher. Cano stated that he and his accountants arrived at a total estimated lost profits of $325,000.00 for the four-year period 1974–1977. Finally, we note that, while Cano did not himself perform any mathematical

calculations while on the stand, he sufficiently explained the necessary operations to enable the fact finder to perform them. We conclude that, based on the testimony of Cano, there is sufficient evidence to permit a reasonable estimate of [the buyer's] lost profits in the amount originally awarded by the trial judge, $200,000.00.

*Id*. at 697. Although the seller argued that there were flaws in Cano's data, the Court rejected the contentions, stating as follows.

It is not difficult to shoot these estimates full of holes as [the seller] has done. On the other hand, . . . we do not think this is a case where it can be really said that there would have been no profit . . . had the contract been performed. We think there would have been some profit. As to the amount, we do not see that our estimate can be any better than that of the [fact finder] and we are satisfied with what he has done.

*Id*. at 698 (internal quotation marks omitted).

The notable difference between *Merion Spring Co.* and the instant case is that the buyer in *Merion Spring Co.* offered evidence to support the finding that it would have realized some profit from manufacturing automotive springs if the seller had delivered the twenty-five machines it had contracted to supply to the buyer. Howard's evidence as to the fact of the loss of the Zanesville job consisted solely of its expert calculating what Howard's bid would have been had Howard been able to rely upon the Peak plant, and summarily opining that Howard "would have otherwise been the successful low-bidder." Howard's Pretrial Statement, 10/17/16, Exhibit A at 9. Absent was any discussion of the factors Ohio was required to apply in awarding the bid and applying them to Howard and the company that actually was awarded the bid.

- 15 -

Howard did not proffer any evidence upon which the fact finder could have relied to find that Howard would in fact have won the bid from the Ohio government if only Peak had not breached the contract. Hence, the trial court excluded those lost-profit calculations derived wholly from the Zanesville project based upon the speculative nature of the fact of the alleged harm. The exclusion was not based upon lack of reasonable certainty as to the amount of profits Howard would have realized if it had the winning bid on the Zanesville job, or even upon a finding that Howard failed to show that it would have made some additional profits if Peak's mixing plant worked as it should have. Indeed, the trial court did not exclude Howard's evidence of lost profits suffered on other jobs resulting from defects in the Peak plant, and did not preclude evidence which would have established generally the existence of a market for Howard's services in which it was unable to compete because Peak breached the contract. Rather, the trial court's ruling that Howard's Zanesville-job-based lost profits evidence was speculative was based upon the lack of evidence that could establish with reasonable certainty that Howard **in fact** suffered the loss of the Zanesville job because of Peak's breach.

Based upon our review of the record and the applicable law, we conclude that the trial court's ruling to preclude evidence of profits Howard purportedly lost from the Zanesville job was reasonable and consistent with Pennsylvania decisions requiring the exclusion of speculative evidence in a

variety of contexts. *See*, *e.g.*, ***Rohe v. Vinson***, 158 A.3d 88, 101 (Pa.Super. 2016) (holding trial court should have excluded testimony that was "simply too speculative and highly prejudicial"); ***Ratti v. Wheeling Pittsburgh Steel Corp.***, 758 A.2d 695, 708 (Pa.Super. 2000) (ruling there was no error excluding evidence that was "based upon second-hand information or mere speculation"); ***Kearns by Kearns v. DeHaas***, 546 A.2d 1226, 1235 (Pa.Super. 1988) (remanding for a new trial where the trial court allowed a witness to offer a speculative opinion); *see also **Appeal of Carnegie***, 53 A.2d 425, 427 (Pa. 1947) (holding it was reversible error to admit "speculative and conjectural" estimates of value based upon "assumed facts of what might or might not occur"); ***Glencannon Homes Ass'n, Inc. v. N. Strabane Twp.***, 116 A.3d 706, 721 (Pa.Cmwlth. 2015) ("Speculative testimony or testimony made without reasonable certainty does not aid the trier of fact and should be stricken.").

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in granting Peak's motion *in limine,* and affirm the judgment entered on the jury's verdict.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/27/2018